IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16-cv-10763 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| RICHARD D. LEGINZA, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Davis was a pretrial detainee at the Lake County Jail when he had an encounter with two correctional officers, Defendants Richard D. Ligenza[1] and Andrew Keeley, during which Davis was pushed up against a wall by Keeley and tased twice by Ligenza. Due to each Defendant's allegedly excessive use of force during that incident, Davis has brought the present lawsuit under 42 U.S.C. § 1983. Defendants now seek summary judgment. (Dkt. No. 55.) For the reasons that follow, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

At all times relevant to this action, Davis was a pretrial detainee at the Lake County Jail being held on a charge of attempted murder. (Defs.' Statement of Material Facts ("DSMF") ¶¶ 1, 10, Dkt. No. 57; Pl.'s Resp. to Defs.' Statement of Facts ("PRDSF") ¶¶ 1, 10, Dkt. No. 58.) Inmates at the Lake County Jail who are not suitable for the general population are housed in the Administrative Segregation Unit ("ASU"), where they are confined to their cells 23 hours per day.

---

[1] Davis's Amended Complaint names "Richard D. Leginza" as a Defendant. However, Defendants spell that Defendant's name as "Ligenza" in their supporting briefs. The Court will therefore refer to him accordingly.

(DSMF ¶¶ 7–8; PRDSF ¶¶ 7–8.) Each day, an inmate housed in the ASU gets to spend one hour outside of their cell, during which time they are guarded by two correctional officers. (DSMF ¶ 8; PRDSF ¶ 8.) A log of each inmate's behavioral history, referred to as a "DL," is accessible to correctional officers at their stations. (DSMF ¶ 9; PRDSF ¶ 9.)

## I. Plaintiff's Prior Disciplinary History at Lake County Jail

Prior to the events at issue here, Davis had amassed a voluminous disciplinary record over the many years he was confined at the Lake County Jail, with violations involving, among other things, insubordination, disruptive conduct, threatening harm to others, damaging jail property, and interfering with staff duties. (DSMF ¶ 12; PRDSF ¶ 12.) Many of those violations resulted in Davis being placed in the ASU for extended periods of time. (*Id.*) By his own admission, Davis was often noncompliant with correctional officers' orders, claiming that he had "free will" and "common sense" and would not "do anything someone tells [him to do] if it doesn't make sense or if it jeopardizes [his] safety." (DSMF ¶ 13; PRDSF ¶ 13.)

At times, Davis acted in a violent manner that posed a risk of harm to others. In January 2014, while housed among the general population, Davis threw chairs in the common room, one of which struck and injured an inmate. (DSMF ¶¶ 14–15; PRDSF ¶¶ 14–15.) Following that incident, Davis asked to be placed in the ASU because the actions of other inmates and correctional officers caused him to fear for his life and safety if he remained in the general population. (DSMF ¶ 16; PRDSF ¶ 16.) Another incident in August 2014 resulted in Davis being charged with battery after he attacked a correctional officer. (DSMF ¶ 17; PRDSF ¶ 17.) The incident began after the correctional officer ordered Davis to lockdown, and Davis behaved in a manner that the officer interpreted as a refusal to comply. (DSMF ¶ 18; PRDSF ¶ 18.) While the officer claims that Davis chest bumped him and threatened to punch him in the head, Davis denies

2

making physical contact with the officer. (*Id.*) Davis does not deny that the incident ended with him walking over to the correctional officer's desk and throwing documents off the desk and throwing a garbage can. (DSMF ¶¶ 18–21; PRDSF ¶¶ 18–21.) Finally, Davis got into a physical altercation with other inmates in September 2015. (DSMF ¶ 22; PRDSF ¶ 22.) During the fight, Davis repeatedly struck another inmate in the face and head. (DSMF ¶ 23; PRDSF ¶ 23.)

Davis also had a history of damaging the sprinkler head in his cell when confined in the ASU. (DSMF ¶¶ 24–26; PRDSF ¶¶ 24–26.) According to Davis, damaging the sprinkler head was the only way for him to get the attention of correctional officers who would otherwise neglect inmates in the ASU. (DSMF ¶ 28; PRDSF ¶ 28.) After breaking the sprinkler head on December 27, 2015, Davis threatened the correctional officer that came to his cell, swearing on his daughter that when he got out of jail, he would shoot the correctional officer in the face. (DSMF ¶ 26; PRDSF ¶ 26.)

## II. Events of December 31, 2015

The circumstances giving rise to the present action occurred on December 31, 2015. On that date, Davis was housed in the ASU and the two correctional officers on duty were Defendants Ligenza and Keeley. (DSMF ¶¶ 33, 37, 43; PRDSF ¶¶ 33, 37, 43.) By this time, Keeley and Ligenza had learned of Davis's disciplinary history from the DLs and Ligenza was also familiar with Davis's character and behavior from his own personal interactions with Davis. (DSMF ¶¶ 9, 32; PRDSF ¶¶ 9, 32.) Keeley was wearing a body camera during all relevant events and video captured by his camera was submitted to the Court in connection with the present motion.

Davis wanted to use his hour out of his cell on December 31, 2015 to do legal research at the jail's law library. (PRDSF ¶ 27.) However, after Ligenza and Keeley rebuffed Davis's request that they retrieve a flash drive containing his legal documents, Davis refused to go to the law

3

library. (*Id.*) As a result, he was denied his hour out entirely. (DSMF ¶ 27; PRDSF ¶ 27.) Upon learning that he lost his hour out, Davis told Ligenza "I could have nailed you" and "I should spit on you." (DSMF ¶¶ 27, 33; PRDSF ¶¶ 27, 33.) When backup assistance arrived, Davis told one of the backup correctional officers "I should beat your bitch ass." (DSMF ¶ 35; PRDSF ¶ 35.) Davis has denied that these statements were threats but instead claims that he was "just expressing his feelings." (DSMF ¶ 34; PRDSF ¶ 34.)

Once Davis was placed back in his cell, he started to kick the door and scream. (DSMF ¶ 36; PRDSF ¶ 36.) He then yelled that he was going to turn the ASU into "Key Lime Cove," referring to a local water park. (DSMF ¶ 37; PRDSF ¶ 37.) Davis then broke the sprinkler head in his cell and flooded the unit, exclaiming "if I can't use the library, no one can use the library." (DSMF ¶¶ 27, 38–39; PRDSF ¶¶ 27, 38–39.) Due to the broken sprinkler head, Ligenza and Keeley came to remove Davis from his cell. (DSMF ¶¶ 40–41; PRDSF ¶¶ 40–41.) However, when Ligenza ordered Davis to put his hands behind his back, Davis refused until Ligenza displayed his taser. (DSMF ¶ 41; PRDSF ¶ 41.) Although Davis was in handcuffs as Ligenza and Keeley escorted him from his cell, Ligenza claims that he perceived Davis as a physical threat. (DSMF ¶ 43; PRDSF ¶ 43.) Specifically, Ligenza believed that Davis was capable of headbutting one of the guards. (*Id.*) Davis confirmed that, even in handcuffs, he had the ability to kick, spit at, headbutt, or pull away from the correctional officers. (DSMF ¶ 44; PRDSF ¶ 44.)

As he was being escorted from his cell by Ligenza and Keeley, Davis understood that he should cooperate with the guards. (DSMF ¶ 42; PRDSF ¶ 42.) Yet Ligenza claims that as Keeley approached Davis in his cell and then escorted him out, Davis aggressively fought against the correctional officer by "shrugging his shoulders, making movements while Officer Keeley was moving him, kicking water at [the correctional officers], trying to splash [them] as [they] were

4

trying to exit him . . . until [they] got to the sally port door." (DSMF ¶¶ 45, 53; PRDSF ¶¶ 45, 53.) Similarly, Keeley stated that Davis resisted him by kicking up water, jerking his body, and yelling and screaming. (DSMF ¶¶ 46, 53; PRDSF ¶¶ 46, 53.) Two other correctional officers who witnessed the events affirmed that Davis was actively resisting Keeley and Ligenza's escort, including by attempting to pull away from Keeley. (DSMF ¶¶ 49–50; PRDSF ¶¶ 49–50.) At points during the escort, Davis shouted at the officers "you ain't strong" and "I'm going to spit on you." (DSMF ¶¶ 54, 56–57; PRDSF ¶¶ 54, 56–57.) Eventually, in an effort to gain Davis's compliance and stop his resistance, Keeley placed Davis against the wall and ordered him to stop resisting. (DSMF ¶¶ 45–46; PRDSF ¶¶ 45–46.)

Upon entering the sally port area, Davis again began to resist Keeley, at which point Ligenza tased Davis. (DSMF ¶¶ 45, 47; PRDSF ¶¶ 45, 47.) This initial tase was deployed with the taser's two probes.[2] (DSMF ¶¶ 60–63; PRDSF ¶¶ 60–63.) Ligenza believed that those probes failed to make adequate contact with Davis, as they appeared to have little effect on him and he continued to struggle. (DSMF ¶¶ 48, 60–63; PRDSF ¶¶ 48, 60–63.) When Keeley and Ligenza tried to stand Davis back up on his feet, Davis refused to comply and stand up. (DSMF ¶ 48; PRDSF ¶ 48.) His resistance continued as Keeley and Ligenza brought Davis onto an elevator. (*Id.*) Consistent with his training on taser use, Ligenza then followed up the first tase with a drive stun from the taser. (DSMF ¶¶ 48, 59, 60–64; PRDSF ¶¶ 48, 59, 60–64.) The second drive stun

---

[2] A taser typically is fired in one of two modes:

> The first mode fires two probes that are connected to the Taser gun by a high-voltage, insulated wire. When the probes make contact with the body, an electrical current passes through the surface of the body. The Taser emits a current as long as the trigger is pulled or for a maximum duration of five seconds. The second method of deployment is the "drive-stun" mode. In this mode the operator presses the Taser to a subject's body and then pulls the trigger to emit a current. The deployment lasts as long as the trigger is pulled or for a maximum duration of five seconds.

*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 859 n.1 (7th Cir. 2010).

5

worked to stop Davis's resistance. (DSMF ¶ 65; PRDSF ¶ 65.) Davis was then offered medical assistance, but he refused and never sought additional medical care related to the two tasings. (DSMF ¶ 68; PRDSF ¶ 68.)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Davis has brought a claim under 42 U.S.C. § 1983, arguing that Ligenza and Keeley each used excessive force in violation of his rights under the Fourteenth Amendment's Due Process Clause. Both Defendants contend that they are entitled to summary judgment because any force they used against Davis was reasonable under the circumstances. Alternatively, to the extent that either Ligenza or Keeley violated Davis's constitutional rights, they argue that they should nonetheless be awarded summary judgment because they are protected from liability by qualified immunity.

The Fourteenth Amendment's Due Process Clause governs excessive force claims brought by pretrial detainees. *Forrest v. Prine*, 620 F.3d 739, 743 (7th Cir. 2010). To prevail on a Fourteenth Amendment excessive force claim, a pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). This is a fact specific inquiry in which a court must account for "the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397. In addition, the court must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of

jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks omitted). Among the considerations that bear on the reasonableness or unreasonableness of the use of force are:

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Where there are no genuine disputes of material fact, "objective reasonableness 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Calhoun v. Wray*, No. 18 C 7551, 2020 WL 4586108, at *3 (N.D. Ill. Aug. 10, 2020) (quoting *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018)).

As to Keeley, the Court finds that Davis has failed to identify a genuine issue of material fact regarding the reasonableness of the force Keeley used when he pushed Davis against the wall. Prior to Keeley's use of force, Davis had already caused a tremendous disruption to the orderly operation of the ASU by breaking the sprinkler head in his cell, which created significant flooding throughout the entire ASU. Keeley was also well acquainted with Davis's extensive disciplinary record, which included at least one incident of violence, and reasonably believed that Davis presented a risk to the safety of correctional officers. And immediately before flooding his cell, Davis had threatened violence against Ligenza and other jail personnel. As the video evidence shows, Davis was acting belligerently and splashing water as he was being led from his cell by Keeley. Ligenza and Keeley also testified that Davis physically resisted through his body movements.

In a modest effort to gain Davis's compliance, Keeley pushed him against the wall. Courts routinely find that simply pushing a noncompliant inmate does not run afoul of the Constitution.

*See e.g.*, *DeWalt v. Carter*, 224 F.3d 607, 619–20 (7th Cir. 2000) (holding that pressing a prisoner against a door was a de minimis use of force that did not violate the Eighth Amendment), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020); *Mitchell v. Richter*, No. 15-CV-1520-JPS, 2017 WL 752162, at *9 (E.D. Wis. Feb. 27, 2017) (finding that no reasonable factfinder could conclude that prison guards who pushed a pretrial detainee into his cell used excessive force). Finally, Davis does not contend that the push caused him any pain or injury. *See Calhoun*, 2020 WL 4586108, at *4 (holding that the defendant acted in an objectively reasonable manner when he "used minimal force to respond to a threat he reasonably perceived, resulting in minimal (if any) injury to" the plaintiff). Indeed, in the video, Davis does not cry out in pain following the push but rather tells Keeley that he "ain't strong." (DSMF ¶ 54; PRDSF ¶ 54.) No reasonable jury could find that Keeley's relatively minimal use of force was unreasonable, especially in light of Davis's numerous provocations prior to that use of force.

Next, the Court turns to Ligenza's actions. After Keeley's push failed to secure Davis's compliance, Ligenza escalated the use of force against Davis by twice tasing him. The Seventh Circuit has previously addressed when the use of a taser on an inmate violates the Fourteenth Amendment's Due Process Clause, although those cases borrowed the Eighth Amendment's standard for excessive force claims brought by convicted prisoners, which requires a subjective inquiry into an officer's state of mind. *Forrest*, 620 F.3d 739; *Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009). Since then, the Supreme Court has made clear that the Fourteenth Amendment inquiry is an objective one—the plaintiff must show that the force used against him was objectively unreasonable. *Kingsley*, 576 U.S. at 396–97. Nonetheless, those pre-*Kingsley* decisions are instructive since anything that would violate the more stringent Eighth Amendment standard would necessarily also violate the Fourteenth Amendment. *See e.g.*, *Gaston v. Beatty*, No. 17-cv-

8

01798, 2020 WL 1288878, at *4 n.8 (N.D. Ill. Mar. 18, 2020); *Williams v. Harmston*, No. 15 C 5045, 2018 WL 2435540, at *3 (N.D. Ill. May 30, 2018). Those decisions provide two guideposts in evaluating the use of a taser on an inmate: (1) "an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable," and (2) "an officer may not use significant force (like a Taser) against a nonresisting or passively resisting subject." *Dockery*, 911 F.3d at 467 (internal quotation marks omitted).

Davis disputes Defendants' contention that he continued to actively resist Keeley and Ligenza's escort after Keeley pushed him against the wall. While the Court is normally required to view disputed facts in the light most favorable to the non-moving party on summary judgment, where video evidence discredits the non-moving party's story, the Court is not required to believe the non-moving party's version of events. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). But the Seventh Circuit has emphasized that this exception to the normal summary judgment standard is "narrow" and does not apply "where the video record is subject to reasonable dispute." *Gant v. Hartman*, 924 F.3d 445, 449–50 (7th Cir. 2019). Put differently, the video evidence must do more than offer "*some* support" for the moving party's version of events but instead must show that non-moving party's version of events is "blatantly and demonstrably false." *Id.* (internal quotation marks omitted).

Here, the video evidence shows that after Keeley pushes Davis against the wall, Davis continues to shout and resist. According to Defendants, Davis then escaped Keeley's hold. (DSMF ¶ 55). On the other hand, Davis claims that Keeley pushed him away. (PRDSF ¶ 55.) The video evidence does not offer an entirely clear view, but it does briefly show Davis outside of Keeley's grasp. Nonetheless, the video does not blatantly contradict Davis's claim that he was pushed by Keeley. Indeed, just before Davis is seen out of Keeley's hold, a voice can be heard

9

saying "let's go," suggesting that Keeley may have given Davis a push to move him along. Thus, the Court finds there to be a dispute of fact as to whether Davis had actively pulled away from Keeley's hold as opposed to being pushed away by Keeley. Subsequently, the video goes black with the audio indicating a struggle culminating in Ligenza's first deployment of the taser in the two-prong mode. Just before the taser is used, Davis can be heard again shouting to the officers "you ain't strong!"

Although there is a disputed issue of material fact as to whether Davis continued physically to resist after Keeley's initial, modest use of force to obtain compliance, there is no dispute that Davis continued verbally to resist the correctional officers. Thus, the question is whether no reasonable jury could find that Ligenza acted unreasonably by determining, based solely on Davis's verbal resistance, that increased force was necessary to secure Davis's compliance and deploying the taser. The Seventh Circuit has found that in "many circumstances—often when faced with aggression, disruption, or physical threat—compelling compliance with an order is a valid penological justification for use of a taser." *Lewis*, 581 F.3d at 477. Here, there is no question that Davis remained defiant after Keeley's initial use of force. Even if his resistance was simply verbal, that did not make it unreasonable for Ligenza to conclude that Davis's behavior posed a threat and to determine that additional force was necessary in the form of a taser. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (finding that the defendant did not act unconstitutionally in escalating the use of force when the plaintiff remained defiant after the defendant's initial application of more modest force); *Forrest*, 620 F.3d at 745 (holding that the use of a taser was justified where the plaintiff "was not merely slow to comply with an order" but "his conduct created a situation where the officers were faced with aggression, disruption, and physical threat" (internal quotation marks omitted)); *Lewis*, 581 F.3d

10

at 477 ("In cases upholding the use of taser guns, the victims have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others."). Further reinforcing the reasonableness of Ligenza's determination was his knowledge of Davis's long history of disruptive behavior, including incidents that posed a risk to the safety of others as well as statements reasonably interpreted as threats that Davis made to Ligenza just before the tasings. *Kingsley*, 576 U.S. at 397 (accounting for "what the officer knew at the time" of the use of force in the objective reasonableness inquiry). The Court therefore grants summary judgment in favor of Defendants as to the first tase.

Next, the Court turns to the second tase. Defendants contend that the taser's prongs did not make adequate contact with Davis and failed to stop his resistance, necessitating Ligenza following up with a drive stun. While the video's visual is largely black in between the two tases, the audio reveals the sound of the first tase followed by Davis shouting "oh bitch!" One of the officers then commands him to stop resisting, to which Davis replies "I ain't bitch, I ain't doing shit, you stupid bitch!" The visual remains black or unfocused, but an officer can be heard again commanding Davis to stop resisting. Davis then asks "how the fuck was I resisting on my knees?" The officers then tell Davis to stand up several times. The video provides no clear visual, but Defendants contend Davis did not comply with that order. Davis agrees that he did not stand but claims that he was unable to do so because of the "excruciating pain" caused by the first tase. (Pl.'s Statement of Additional Facts ¶¶ 10–11, Dkt. No. 60.) Nonetheless, the officers then dragged him to an elevator. (*Id.* ¶ 12.) Upon entering the elevator, Ligenza followed up with the drive stun. In response to this second tase, Davis can be heard on the video shrieking in pain.

According to Davis, the second tase was an unconstitutional use of force because the first tase rendered him unable to resist. Given the lack of a clear visual, the Court is unable to conclude

11

that the video evidence blatantly contradicts Davis's version of the events following the first tase. Indeed, the audio indicates that Davis's verbal resistance was overcome by the first tase, as he says nothing until a correctional officer again commands him to "stop resisting" to which Davis responds "how the fuck was I resisting on my knees?" Davis's response is consistent with his contention that any physical resistance perceived by the correctional officers was in fact a product of the pain he experienced from the first tase. Thus, there is at least a disputed issue of material fact as to whether Davis's continued resistance following the first tase necessitated the second tase.

Of course, even if there is a disputed issue of material fact as to whether Ligenza's second use of the taser ran afoul of the Fourteenth Amendment, summary judgment may still be appropriate if Ligenza is protected by qualified immunity. Qualified immunity protects public officials from being monetarily liable unless the evidence shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). For Davis to show that Ligenza's second tase violated his clearly established constitutional right, he must "present[] a closely analogous case that establishes that [Ligenza's] conduct was unconstitutional or . . . present[] evidence that [Ligenza's] conduct was so patently violative of his Fourteenth Amendment right against excessive force that reasonable officials would know without guidance from a court." *Calhoun*, 2020 WL 4586108, at *4 (internal quotation marks omitted).

Davis cites *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013), for the proposition that the use of a taser on a non-resisting or passively resisting subject is a clearly established violation of that person's right to be free of excessive force. In that case, the plaintiff was tased once by a police officer, which the Seventh Circuit found unquestionably subdued her

as "she immediately fell to the ground and convulsed but made no movement after the first tasing ended." *Id.* Thus, when the officer tased the plaintiff a second time, it violated her clearly established constitutional right because it was well-established "that police officers cannot continue to use force once a suspect is subdued." *Id.* Given the dispute of fact as to whether Davis was subdued after the first tase, the Court concludes that *Abbott* is sufficiently analogous to preclude granting Defendants summary judgment on the basis of qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 55) is granted in part and denied in part. The Court finds that there is no genuine dispute of material fact as to the reasonableness of Defendant Keeley's initial use of force and Defendant Ligenza's first use of the taser. Summary judgment is therefore granted in favor of Defendants insofar as Davis's excessive force claim is based on those uses of force. However, the Court finds that there are disputed issues of fact concerning the reasonableness of Defendant Ligenza's second use of the taser, and therefore summary judgment is denied as to that use of force.

ENTERED:

Dated: March 29, 2021

Andrea R. Wood
United States District Judge

13